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, 13-23-20, United States v. Multiple Defendants. Good afternoon, Your Honors. May it please the Court, my name is Ruth Liebesman and I'm here on behalf of Ismael Cruz-Ramos. Your Honor, may I reserve five minutes for rebuttal? Thank you, Your Honor. I know the Court has carefully reviewed all of our issues and there are several. I think that unless the Court has another issue that it would like me to address, I would like to address the issue of the search and seizure at the Burwinder States in my client's home. First and foremost, I wanted to address the issue of the search of the Ford Expedition. As the Supreme Court noted, the word automobile is not a talisman around which the Fourth Amendment disappears. In this particular case, as the District Court found, the Ford Expedition that was searched was on the property of the defendant. It was inside a carport. It was blocked in by two other cars. It could not be seen from the street. It could not be accessed except for walking in through the house and out through a side door into the carport where, once again, it was blocked in. For all intents and purposes, Your Honors, this car may as well have been on cinder blocks. It was not mobile. Any person who may have had access to this automobile at the time of the search was already in custody. In U.S. v. Payne, which was cited very favorably by the Supreme Court, which is a Ninth Circuit case, the Supreme Court cited it in Coolidge. The campers were seen smoking marijuana at a campsite on federal parkland. Their car was parked a slight distance away. The campers were bedding down for the night to go to sleep. The officers engaged in a warrantless search of the automobile under the automobile exception. And the Ninth Circuit said this was not an automobile exception case because there was nobody really to move the car. There was sufficient cause to maintain the car where it was. The people were bedded down for the night. They could have gotten a warrant. This case is far more egregious because we have a situation in which the entire premises are secured. The defendants are all in custody. The car, regardless of who is around, is immobilized. And yet, the district court found that the automobile exception applied because the officers were legitimately, in the court's opinion, in the curtilage of the house. Counsel, the district court relies heavily on the good faith exception here. How do you respond to that? I don't believe there's a good faith exception at all in the automobile search. There's black letter law. And these officers know it. As far as good faith, I think that the court used that more with regard to the entrance and circumstances for the entry onto the property. Well, it seems to apply to the automobile search as well. Well, I think that, Your Honor, there's no good faith exception when you're simply outside the bounds of the law. And they made no attempt to get a warrant. There was never an attempt to get a warrant at any point in this. They entered the property based upon a tip from an unknown informant with whom they'd never done business before. When he said, well, I know where this guy is hiding, they took him to the place to see where it was and then came back with a team. There was no attempt to get a warrant at all in any of this. And as far as an exigent circumstance, I'd like to read what the district court said about the entry onto this property. The district court said, what was most frustrating about the police action, however, was that the PRPD simply assumed a warrant could not be obtained and did not try. And skipping ahead, considering Bernard, and that is the man they went on to get, without a search warrant, they went with an arrest warrant for a man named Bernard who did not live at that property. Considering Bernard was one of the most wanted fugitives in Puerto Rico, an exception to the murder requirement may have been made. Now, they're saying that in Puerto Rico, you can't get a search warrant at night unless it's a murder, which is simply inapplicable to the federal charges against this man. But I have to say, Your Honor, that when a person is charged with shooting down a police helicopter, killing all on board, killing police officers in the line of duty is as murder as it gets. I do not see how this argument is made over and over and over again that they couldn't get a warrant because it wasn't a murder case. I just, I can't even follow that argument because he was wanted for murdering police officers. Police officers count. Just going back to the automobile issue, what's the prejudice in your view, assuming it should have been suppressed, what was found in the automobile? Every piece of physical evidence against my client was found in that automobile. There is no physical evidence against him outside of that automobile. Aside from, and there's his confession, which is an entirely different issue. But if we, so there's... And there's not, then there's testimony of three witnesses, all of whom contradicted one another. But the confession and the testimony of three witnesses, I recognize you've got a problem with the confession and that you might question the weight to give to the three witnesses. But am I right that the confession and the testimony of the three witnesses combined covers all of the material, or draws a link between your client and all the material found in the expedition? The, not necessarily the witnesses, Your Honor. I believe the witnesses testified to his activities. But nobody that I'm aware of testified as to what was in the expedition at that particular time. No, I'm sorry, I understand that. But in terms of the charges that grow out of the physical evidence taken from the expedition? Yes, absolutely true, Your Honor. But once again, the witnesses, one said he was a drug point owner, one said he was an enforcer. So the reason you would say it's not a harmless error is because the weight to give to the witness of testimony is too weak to make it harmless? It is absolutely, Your Honor, because you have three witnesses who not only spent two years in the same unit preparing together to testify, but the first witness to testify went back and sat down with the other two and told them what he had said on the first day of trial. So they, and they still did not match up their stories. So yes, Your Honor, I think there's a real problem with the weight to give to them. Assuming we let the confession in, which I realize you're challenging, but if we did leave the confession in, what does the confession cover with respect to the materials found in the expedition? I believe the confession, Your Honor, if it's allowed to stand, would do a great deal of harm to his case. But the fact is, Your Honor, that when he, his confession... If we let the confession in, why doesn't it render whatever error with respect to the automobile search harmless? Because the confession is still subject to a great deal of cross-examination, which was not allowed with the fact that the officer, his habit was to have a waiver form filled out. He didn't have one with him. He couldn't find a piece of paper. There was so much, even if the confession is allowed to stand, there's so much that makes that confession unreliable. I'm sorry, one last, is there anything missing in the confession? In other words, does he confess, I just didn't forget any details, but does he confess if he gave full weight to the confession? Would it cover everything found in the automobile? It would cover the charges. All the charges. It would cover the charges, Your Honor. It would not... I got it. Not the drugs, it would cover enough for the racketeering. It would not make up for the evidence suppressed from the car. It would not cover all of that, but it would be sufficient for a conviction if it was believed by the jury given full weight. It would be enough for a conviction under the charges. However, this is, as Your Honors know, a case in which defense counsel was not allowed to cross-examine the officer about the situation under which the confession was taken, and there is a lot that is wrong with it. Let's elaborate on that a few words. What were the circumstances of the confession that were precluded by the judge's ruling on cross-examination? You've mentioned the waiver issue. Is there anything else that was precluded by the judge's ruling? The judge would not allow him to cross-examine any aspect of the manner in which the confession was taken, whether he was given a piece of paper to sign, whether he waived his rights formally. It was basically treated as though admissibility meant that the weight to be given could not be challenged. Well, the judge seemed to take the view that he had already made a determination on voluntariness, and the purpose of the cross-examination was to challenge that voluntariness. I gather you take, even if that's true, I gather it's your position that you were, were you trial counsel? I was not trial counsel, Your Honor, no. Okay. That trial counsel was entitled to challenge even voluntariness in the eyes of the jury, that they could try to do whatever they could to undermine the reliability of that confession. Well, the Supreme Court said so too, Your Honor, in Crane v. Kentucky. And the evidence surrounding the making of a confession is all fruitful cross-examination, including whether or not he wrote it out, whether or not it was written out by another officer. And they did not call the officer who supposedly took notes of this confession to say, yes, here are my notes. So the officer who testified had no notes, took no notes, did not even go get a piece of paper. You know, he said he looked all over the department to find a waiver form but couldn't find one. But I'm sure they had blank pieces of paper. There is plenty of reason to believe that the confession may never even have been made. And that's something that counsel was totally entitled to argue to the jury. He didn't bother to even get a piece of paper. So the confession was so limited that there was no cross. And on top of that, Your Honors, at charging the jury, the judge instructs them, you should take into account all of the circumstances under which this confession was made to determine whether it was made, and if so, the weight to give it. How could they find anything except that the confession was made and to give it full weight when there was absolutely no cross-examination allowed. It's the very issue that the judge instructed the jury to consider. There was a reference to traditionally noticing the plea agreement, or a plea agreement in another case regarding the confession of my misremembering? I believe you're misremembering, Your Honor. This was simply a case where his alleged post-arrest statement was recited to the jury by the officer who took this supposed statement. I thought the judge found that there was essentially no prejudice following from this because there was another indication that your client had basically said that it was voluntary. No. The court simply found basically that I have decided, I mean the royal I, I have decided that this is a voluntary confession and therefore you do not get to go into the circumstances under which it was made. Thank you, Your Honor. Thank you. Good morning, Your Honor. May it please the court, Henry Marinas on behalf of the appellants, Mr. Salgada, Rivera, and Ramirez, I'm sorry, Mr. Ramirez, Rivera, and Lorena Salgada. Your Honor, I would like to start with the basic premise of the selection of the decision by the district court to allow for an anonymous jury. In this particular case, I think it had a really chilling effect on the procedure and actually played a major role in the conviction of the appellants. As the court is very much aware, it's within the court's discretion to select, to impanel an anonymous jury, but in this particular case, the court started off with the premise that there were some uncharged murders in this case and the court started the process by informing the jurors, the veneer, that there had been this horrific murder of these police officers in a helicopter. Now, most of the jurors in that panel had knowledge or at least had heard of the incident. Obviously, it's a small island in Puerto Rico and everybody would have got some information regarding that. In fact, most of the jurors raised their hand and expressed to have strong opinions regarding that particular incident. It's important to note that the three defendants that went to trial on this particular case were not part of that particular incident. However, that was an uncharged crime for the organization that the government claims as a whole was responsible and that this entire organization named Laona, that all these defendants were in fact part of this racketeering enterprise. Now, when the court starts off the premise with that condition, it had a chilling effect on the jurors' ability to be fair and impartial because no longer do the jurors believe that this is a situation where they're just going to go there and do their civic duty. They're now under the impression that their personal safety is an issue. Didn't the court stress, though, that it was granting the anonymity not because they should fear the defendants because of that incident, but because it was an incident which generated a lot of public interest in press coverage and therefore the court was protecting their identity so that essentially they wouldn't be hounded by the press? I think that's one of the factors, Judge, but I think beyond that, I think the court was looking at the fact that the government had requested that they impound an anonymous jury based on the indictment alone. I think that if the court would have made an inquiry or at least had a hearing to determine whether these particular individuals were of the violent nature or would have posed a threat to the actual jurors, then that would have been something that would have at least tried to deal with the issue and would have been another factor that the court could have considered and whether that was an appropriate step to take. Because once you go that route, it's difficult for the jurors to be fair and impartial when they understand that there were several murders that occurred and, in fact, there was only one murder that was actually attributed to the racketeering of these three individuals. There were nine in total, but one in particular that they attributed that these defendants had some kind of indirect activity in. Now, when the jury had the court decided to have an actual hearing to determine whether or not it would have been appropriate to take that drastic step, I think the court would have came to the conclusion that it wasn't necessary, considering the fact that this was a 33- I'm not exactly sure what type of hearing you're referring to. Well, I think the court couldn't inquire further than just receiving the government's assertion that the indictment itself will give it the credibility of the way to believe that somehow it was necessary to impanel an anonymous jury. So that's one of the premises, I think. I'm not saying that there's a hearing that could have been had, or at least the court could inquire further, and the way the court would have inquired that could have been through different- they could have asked the government to proffer some additional information or at least taken additional steps to determine whether or not it was, in fact, necessary, considering that there are many, many large indictments that are issued out of Puerto Rico and there isn't this impaneling of anonymous juries on every one of those single cases when we're dealing with much more violent individuals than the three that were involved in this particular case. So, Counselor, your argument on this point is not that the inability to get the names, addresses, any kind of identification of the jurors didn't prevent an adequate inquiry into whether the jurors could be fair and impartial. Your argument seems to be that the very fact that the jury was anonymous and the explanation of why that was- when the jurors were told that their identities would be kept secret, that that had, you say, a chilling effect, that the very fact of proceeding with an anonymous jury is what the prejudice was. Is that your argument? Judge, I would argue that it's on both premises. Number one, it did have a chilling effect, and secondly, that the fact that the attorneys could not inquire further as to the locations where some of these individuals lived. This is primarily dealing with two or three different areas, housing projects in Puerto Rico, and, in fact, one of the jurors that ultimately made it onto the panel lived in one of those locations. So they would have had intimate knowledge of some of these instances that occurred and would have been able to theoretically have that discussion with the other jurors during the deliberation process. So the attorneys couldn't even use any clause challenges or preemptive challenges on any of these individuals because they didn't know their background, so the fact that they weren't anonymous jurors also did have an ultimate effect. In fact, one of the jurors, juror number 30, was instructed not to speak about the case, went home promptly and spoke to her husband about that she'd been impaneled in this jury outside of the instructions of the court and, in fact, came back and was allowed to get a doctor's note, psychiatrist's note, saying that she's having psychiatric issues based on the fact that she's been impaneled in this jury. Now, I think that the description of the court and the fact that this juror is now an anonymous juror and is instructed by the court that they are not to reveal any information during the V.I.D. process that could reveal their names, addresses, or anything like that, added to the heightened fear that this particular juror had, and that you can pretty much assess that would happen across the board. Now, this particular juror was the district court, despite the recommendations or the requests from the defense team, that they question the rest of the jurors to determine whether there was a cross-contamination or they had some contact with the rest of the jurors. That did not occur, which is also another factor that we outlined. And, in fact, the juror was allowed to go back and was questioned by the court as to whether or not she's a suitable juror and was determined not to be. However, the district court refused to speak to the other impaneled jurors to determine whether there was any contact, and I think that also was very prejudicial to my client, considering the fact that that juror had already violated the court's order not to speak about the case and had, in fact, spoken to the case with her husband and her psychiatrist. Secondly, during this questioning process, the defendants weren't allowed to be present, were not present during this questioning, where they might have had additional questions for that particular juror. The court indicated that they might have created an additional strain on that particular juror. However, her husband was allowed to be part of that particular process, and the defendants were not. Well, their lawyers were there. Their lawyers were there, Judge, but there might have been questions specifically that the defendants might have requested or asked them to see whether or not that particular juror was familiar with the location, was familiar with anything else that would have heightened her sense of fear. And, obviously, they would have known that, and defendants could have assisted in that process and weren't allowed to do that. Additionally, there was another juror. But was she getting excused? At that point, she was excused, but the determination whether to excuse her or not was happening outside of the presence of the defendants. Ultimately, she did get excused based on the fact that she came in and said she was having psychiatric issues based on the fact that she was a panel leader, but I think that was all heightened security based on the fact that there was an anonymous jury and the instructions that the district court gave the jurors to make sure that they didn't reveal certain personal information about themselves that could put them at harm's way. You didn't say that, though. Well, she didn't say that that was one of the reasons. She said just being a panel on the jury and the fact it was a level of violence caused us to have this to come back and indicate that she wasn't fit to stand as a juror. But, additionally, there was also another juror that was never questioned. That juror, when the court was inquiring as to whether or not anyone had heard of the incident with the police helicopter, there was one juror that did raise her hand, and most of the jurors that did raise their hand were excused. This juror was never questioned and actually ended up being on the panel and it turned out to be later on that she actually lived in the neighborhood where this activity was going on. So I think that was very highly prejudicial to the defendants. Did the police counsel present any kind of objection at that point during empanelment? The trial counselors did object and indicated that they wanted that particular juror questioned and at least the panel wasn't told. They actually wanted the entire panel stricken and that was the line. But, I mean, Juror 56, did they specifically object to any lack of questioning by the judge as to Juror 56 at the time of the empanelment? Yes, Your Honor. They said that she had raised her hand and it never got to her, but they moved on and didn't really address that issue. What did the courts respond? I think the court indicated they were going to address it and they just never addressed it. I believe the issue was preserved for appeal. But furthermore, Judge, you know, just dealing with the issues, with those prejudices, just dealing with the voir dire and the jury selection, I think all had a chilling effect on the ability for the defendants to have a fair and impartial jury. Furthermore, I think one of the other important factors in the brief that we briefed were the fact that the government came making this assertion that there was a fact, you know, this was becoming a RICO Act. And they continue to try to establish that this particular group were in fact an enterprise, but they feel short of that. And one of the errors in the defense opinion was that the court refused to give an instruction to the jury after the conclusion of the case, instructing the jury that there were multiple conspiracies, not one conspiracy. And throughout the entire testimony of the three witnesses, the government witnesses, they continue to testify to the fact that these locations had, or housing projects, that had individual owners who ran the drug points, that they weren't specifically an enterprise. And in fact, what the owner referred to was a peace agreement. And it wasn't specifically an organization as such. It was a peace agreement that was made between the members of those housing projects so that they wouldn't interfere with each other and they wouldn't, you know, they could basically continue to do business but not interfere with each other's businesses. But it wasn't in the situation where they were all part of one enterprise. And in fact, the testimony of one of the three government witnesses indicated that at one point he had a drug point and that he could not sustain a drug point. He had to get his own drugs, his own money, and he was unable to manage the drug point. And therefore, he had to give it up because he didn't know how to properly manage it. There weren't any stunts being shared by the organization. The organization, if you want to call it that, didn't have any hierarchy of membership, although we know that's not required. There weren't any profits being made by the organization. There weren't any decisions being made by the owner concerning how the drugs would be distributed, money being shared, who was going to be killed. In fact, the decisions about some of those things were just basically one-on-one decisions being made by members of different drug points with particular gripes that they had with other rival organizations, which was the La Rompe Uno, which is Break the Peace Accord. And their particular rivalry were individualized by certain members that they had their personal conflicts with those members. And they individually would make the decision whether or not someone was going to get shot at or killed or something like that. It wasn't an organizational structure. Nothing in all the testimony that was provided either by the police officers or by the three cooperating witnesses indicated that this was nothing other than a bunch of multiple little small conspiracies that were acting independently of each other. I mean, that view of the case is belied by the evidence that went in with respect to the murder of Pequero. I mean, there is actually a description. There was a planning meeting involving individuals who I guess from the government's point of view were in a very informal way part of this enterprise. And there was an agreement that he was a leader of a rival organization, and hence they were going to kill him. And it seems to be the government's argument that the way in which they decided to eliminate Pequero was the way in which they decided to eliminate other individuals. I mean, there was testimony about four or five other murders. All of it seemed to relate to a turf battle. And it was an effort to protect the turf of these individual drug operations in various housing projects. But there was coordination, if you will, in trying to protect the turf of these various individual drug points. Why doesn't that qualify as an informal kind of enterprise required by RICO? I think other than the fact that they were involved in drug activity, there wasn't much more of a coordination. Because I think when you look at it, the murder of Pequeque that we referred to, Toledo, I think that particular murder was the court established that the government established that it was in fact a murder and that Pequeque was killed. And that particular incident is whether you believe the witnesses or not. And, again, we discussed the fact that these individuals, the three cooperating witnesses, were sitting with each other for a long period of time in jail indicating what testimony they were going to give. But giving the light most favorable to the government in that particular murder, only two of the individuals were supposed to basically have any part in this. One indicated after the fact that they were going to remove the hitman that was shot trying to commit this murder, that they would extract him from there and would be part of this extracting team. And the other part was whether or not they were going to contribute towards the payment of this hitman. So in that particular instance, there may have been some coordination. But that wasn't for the furtherance of La Juna. That wasn't for the furtherance. That was just a particular gripe between the individuals in Lagardinas in this particular drug housing project and the other housing project in Copay. They weren't specifically, this was not going to advance any members of the opponents because at that point they were, as the government indicated, they were the manager of their own drug point. So by this activity, it wasn't going to expand their reach to another project or another property or preserve theirs. It was just strictly a personal vendetta they had against each other and nothing in the evidence or nothing to support it. But either testimony indicated it was anything other than that. Thank you, Counselor. Excuse me? Thank you. Thank you. Please record. Victor Acevedo on behalf of the United States. Now, defendants have asked or questioned whether the search of the expedition was valid under the automobile exception. And we submit that it is. First of all, when we look at the applicability of the automobile exception in this case, we can't forget that how were the agents, why were the agents there and how were they able to get in? We can't just look at it, oh, they went into a private property and they searched a red expedition. No. They justifiably entered that property under probable cause and exigent circumstances to arrest not anyone, just Bernard, who at the time was the most wanted fugitive for shooting down a police helicopter and killing a copilot in the process. Now, once they're inside, they know from the CI that's providing the information, who is actually Jose Gutierrez Santana, who testified at trial, that inside that vehicle they were going to find firearms and drugs. They see that red expedition. It is mobile. They have the wheels. It's there. They enter it. They search it. And they're able to see the drugs and firearms. Now, the court asked the defendants a question whether there is any other evidence in the record that talks about that red expedition and the firearms. And there is. I asked the court to look at the trial testimonial of Jose Gutierrez Santana. He does talk about the red expedition and firearms. Now... Counsel, the car was mobile in theory, but it was blocked in by two other cars and the premises were secured at that point. What would have prevented them from getting a warrant? Well, I think we need to look at the automobile exception just as a recognition that cars have a decreased expectation of privacy just because they're mobile. And in this particular case, that's why we're saying that the automobile exception should apply. True, a search warrant wasn't obtained. And true also that the premises were in theory secured. We can't forget that at that time there is testimony in the suppression hearing that the agents testified that in the surrounding areas you had several public housing projects that were owned or controlled by LAONU. And there was a real fear by these agents that they could be ambushed by LAONU members. And we must remember that there is testimony in the suppression hearing where one of the agents said that when they tried to arrest their main leader, who is known as Hincho, and you will be able to see the superseding indictment as number one in the indictment. When they tried to arrest him in a different public housing project that is not Las Dalias, but it's owned by LAONU, they were actually shot at. Police was actually shot at trying to arrest this individual. So they did have an inherent fear while there, while executing, or while opening that expedition that they could be ambushed. And that is reflected in the record when they... That goes to whether there's an exigency continuing on. But putting that aside, was that district court concluded at some point that we're secured and the argument there was a continued exigency wasn't a strong one, which I suppose we reviewed that for clear error, right, the facts that they found on that. So just going to the automobile exception, is there any case in which the diminished expectation of privacy that you point to to the automobile is applicable in a case where the car is parked and blocked in in a house? I don't have a specific case that has those... What would be the logic of saying that you have a diminished expectation of privacy in a car parked in your garage? Well, I would say that the car has a diminished expectation of privacy because even though it's parked in the house, it is not part of the house. It is still a separate entity, still mobile. And let's not forget, this is a red expedition, a red expedition. So I know there's an argument that it's blocked, but technically if we were to be a little bit creative and think about what could happen, how could this car become mobile? Technically, if that car could be used to ram, and I'm just obviously extrapolating and going outside the record here, but it could be used to actually ram and leave the premises in theory. So I'm just saying that the vehicle, even though it is parked, it is still mobile, it is still not part of the house,  than when analyzing a house or a home or some part of the house. How is it different from the umbrella stand? From the what, sorry? The umbrella stand. The umbrella stand? Well, there was a... Part of the search the district court did suppress. I think it was something by the front door. Okay. A flower stand. There was a flower stand in the... How is it different from the flower stand in fact? The terrace where the flower stand was located, it can be considered still part of the house, because it's literally part of the house. It's literally part of the house. It's not something separate like the car, which is something a complete different entity. So a cabinet in the car port, you would say, is just like the flower bed. A what, sorry? A cabinet in the car port would be part of the house. A cabinet? Yeah, in the car port. In the garage. Yeah. You just... You say yeah, right? But the car that's parked right next to the cabinet, even though it's locked in, we have to treat that as totally different. That would be my argument. And you're going to say another sentence? Why? Just because a cabinet can't go up and move. Just the mobility is the whole... Mobility would be the argument, Your Honor. Just because the car is, in theory, still mobile. Because it works, because it has wheels, because it has tires. Counsel, I think the district court does rely on the good faith exception in denying the motion to suppress. I don't seem to have you brief in front. I don't think the government actually, in arguing that the motion to suppress was properly denied, I don't think you invoked the good faith exception at all. Is that correct? And if that's correct, I gather you don't think it's a good argument. I don't think in the motions that were filed for the suppression here, it was invoked.  What I'm saying is that we do think it's a good argument, and we think that the good faith exception, if the court deems that the automobile exception doesn't apply, it should apply. Because there is no clear law as to whether you can search, but that makes a distinction between a vehicle that's in a private property or one in the middle of the street. It just says automobile exception applies if you have PC energy. That's the test you'd like us to adopt? Whenever the law is unclear, you'd be available for a good faith exception? No, I wouldn't say that. I would say in this particular circumstances and facts in this case, I would urge the court to find that the good faith exception applies. And why? What about the circumstances? It makes a difference. In Davis, there was binding appellate court precedent that the law enforcement agents relied on, and the court there said when a court has told you what the law is, you're entitled to rely on it even if it turns out to be wrong later. You're now asking us here to go pretty far and say if you don't know for sure what the law is, any reasonable guess you make, there's no violation. No, I would never suggest that. That would be a dangerous precedent. What I am urging the court to find is that when analyzing the fatality of circumstances and facts that were present when this expedition was searched, there is no egregious or really reckless conduct by the police that should warrant suppression or should preclude the good faith exception. In this case, the police were genuinely acting out of fear for society and fear for themselves and trying to protect when they searched that expedition. So I don't think you should definitely not find a rule that when the law is not clear, good faith applies. It's not dangerous, but in this case it should because the police are justified in their course of action. Now, if I may continue to address the... Just one last thing on the automobile. I don't remember in your brief you arguing, but maybe you did, that even if you suppressed it, it would be harmless error. I don't remember it being on the brief, Your Honor. So you're not arguing that it's harmless error. I mean, you usually would argue that in the brief. I do believe it's harmless error. But in the briefing to us, did the government set forth the argument that it was harmless error? I don't remember that. Now, Your Honor, as to the jury... Generally, the defendants raised some very specific arguments that the government declined to address in its brief. And I was trying to figure out what we're supposed to do with that. I would gladly address them here today if it pleases the court. I'm ready to brief the court on those issues. But has the government waived the right to argue those? I'm ready to brief them, Your Honor, if it pleases the court to file supplemental filing. Obviously, I can only... I'm hearing the oral arguments, so I'm glad... That's not usually the way it works, counsel. I mean, if you want to challenge an argument, you brief it, and that gives us a chance then to explore the different positions. You don't get an after-the-fact opportunity, usually, to make those arguments. Why shouldn't we conclude that, in light of your silence, you have no good response to the argument that's being made? Why shouldn't we draw that conclusion? Because I do have a good response. But I know what the court is saying. I can't excuse the lack of or what was not addressed on the brief. I can only stand here before you and be ready to ask any questions or address any deficiency that you may have found. So if the court would allow me or have any questions as to the matters that were not briefed, I would gladly address them. And now I'll go into the jury issues that were brought forth by the defendants. First, as to the anonymous jury issue, if you look at the record, there was actually an affidavit filed by the government, as I filed it. I was one of the trial attorneys. And in there, you see an explanation of how different of the murders that were committed were actually made for purposes that showed that could affect the fact-finding or harm or could be a potential harm to the jurors. You have murders that were done for people who were believed to be engaging in cooperation with law enforcement. And you had one particular murder that was particularly troubling, which is the Jose Alberto Casanova-Claudio murder, where they literally, the leader, ordered that murder from prison, from the cell phone. So when you look at the anonymous jury, it's definitely justified. This is a case where you have to look at the indictment. The defendants can't be looked at individually and see, as defense suggests, oh, let's see if they individually represent a harm to the jury. No, they're part of an organization, a huge organization, that covers a big, big swath of the metropolitan area of San Juan. And they're fellow members. And the murders that this organization does and the type of murders that this organization does is directly attributed to them. So it was completely reasonable for the court to impound on an anonymous jury. And it was definitely supported by the record when it took that determination. What were the jurors told as to why the court was going to preserve their anonymity? Well, the court tried to avoid at all costs suggesting to the jurors that they were in any way possible in potential harm. They literally said that all we are withholding is your name, address, and place of employment. So the court was very conscious of the fact of what the court could say that could affect the jury's fact-finding mission. So we submit that the process the court did with the anonymous jury was to keep it as transparent as possible, to allow the jury to do its decision in an impartial manner. So maybe I misunderstood the opposing counsel's argument. I thought there was a suggestion that the court did make reference to some acts of violence as a basis for, in the presence of the jury as a reason that their anonymity was important. That's not correct? That is not precise, Your Honor. The defense counsel did, what the court did is at some point during jury selection, it did make reference to a helicopter incident, but not for the purpose of deciding or explaining to them why they are anonymous. It was to determine whether anyone there had a preconceived notion as to this incident which would not allow them to take part impartially in this process because it was such a well-known incident in Puerto Rico still to this day at that time. So it wasn't as part of or to instill fear in the jury in any way possible. Now as to, they bring up juror number 30. Juror number 30 was clear in that her fears were only conveyed to her psychiatrist mother and husband. There is no evidence on the record that she in any way contaminated the jury pool in any manner. So all the defendant has done as to that is pure speculation. There is no evidence on the record that there was any misconduct with the right in any way, that the jury in any way was tainted by this process. And as the court correctly pointed out, juror 30, when this meeting took place, happened after she was going to be excused. It was just so the record was clear as to why were the reasons and so defense counsel could have a chance to question her. And when we analyze that situation, we can't forget that the record reflected that this witness had depression, anxiety, and this is not depression or anxiety mid-level. This is high-level depression, high-level anxiety, and her own psychiatrist recommended that she not take part. Counsel, what wasn't clear to me from the record was how much time, if any, she spent with the other selected jurors after empowerment was completed. I couldn't figure. In other words, so if empowerment was completed at the end of the day and everyone was discharged, that certainly would have diminished any amount of time she had to taint the other jurors. I just couldn't tell from the record. If memory does not serve me wrong, it was literally almost the next day or very, very close. I do remember that it was very, it was almost like, oh, they selected a jury and this happened. We just learned about what the juror number 30 and her issue. So this is very, she had very little interaction or no interaction at all with her fellow jury members, and the opinion and order from the court reflects that, that she stated that she only conveyed her fears to her mother psychiatrist and husband. So now, as to the sufficiency of the evidence argument, here at the end. While you're on jurors, do you want to talk about 56? Sure, Your Honor. Basically, if you look at the record as to how jury selection took place, you will see that there is a lot of accessibility for the jurors to let the court know if they had any issues with any particular part of this case. In fact, they were handed microphones and they would talk to the microphones, and the judge was very, very accessible and trying to make sure that this jury that was chosen was adequate for the trial. Now, I don't remember if the juror 56 raised her hand or not. The fact is that there is no evidence on the record, and the juror defendants haven't placed any evidence on the record that this jury pool was tainted in any way or the final jury was tainted in any way, and I submit it's their burden to show that there was some taint or some impartiality because of this whole incident, and all I've heard respectfully is speculation as to this fact. Well, how can they do better than speculation if they weren't given an opportunity to explore why? The representation is that juror 56 was seen to raise her hand and take it down, and the further representation is made that in light of that, they wanted the court to more thoroughly allow an inquiry of juror 56, and that wasn't allowed. So how can they do any better than speculation if they weren't given the opportunity to ask for any questions? I understand the court's question. I would submit that juror 56, because of the environment and the accessibility that all jurors have to inform the court of any issues they had with the case, if she had a real issue, something that would have not allowed her to take part as a juror in this case, she had the opportunity and the chance to talk to the judge, and again, I urge the court to look at that transcript of how that took place, and you will see that jurors had that chance, and some did actually take advantage of that when they found it appropriate. Is that juror from one of the neighborhoods involved, one of the housing projects involved, or not? I don't think any of the jurors were from any of the public housing projects. The argument that that juror lived near those housing projects, everyone lived near those housing projects. If you look at where those housing projects were, they are in the vicinity of Jujuyo Alto, Carolina. This is just a lot of people. That's where you said the large municipality, yeah. Yes, a lot of people lived nearby, so it would be, Puerto Rico is a small island, so it would be densely packed, so technically, you pass by, I pass by, just as an example, I pass by public housing projects weekly, and that's just how it is, that's how it's built. So I don't think the fact that that juror, we submit that the evidence reflects that the jury may have lived near any public housing project has no bearing as to her impartiality, because that would preclude anyone from being, or most people from being a juror in Puerto Rico. That doesn't make any sense, otherwise the judge wouldn't have asked the question, if it didn't matter. Well, I think the judge did ask the question as to whether they lived there, but it's more as to whether that would raise a genuine fear, because you can live near a public housing project, and that doesn't necessarily mean you're going to fear having to see a trial against people that actually control those public housing projects. That's why that question was posed. Well, I guess the point is that the juror raised his hand and no one got a chance to probe. I haven't delved into the record that much. Is that true that they asked to question that juror and the court wouldn't allow it? It wasn't as to the public, if my memory serves me right, I think it was about the helicopter incident. There was an objection as to whether the juror, when the helicopter incident was brought up, the juror, allegedly juror 56, raised her hand, and then she placed it down, and defense counsel objected to that because they wanted to question her more as to that. It's an incorrect one. They were not allowed to do so. They were not allowed. No one could, the judge, I think the judge did not see her raise her hand, and for that reason, he didn't really go into it. But I think, again, it's because the ambience in that jury selection was such that jurors could literally get up and express any fear and concern to the judge at any point with a microphone. I think the court was correct and did not abuse its discretion in continuing on with the process because that juror had the chance at any point to re-raise that concern if she, if it was something that really affected her. Just on that point, and I think this is one of the points that the government didn't address, one of the appellants makes the argument that there was, in fact, so little communication from the jury that they were not able to assess whether the jurors were proficient in English. My understanding is that all jurors in the District of Puerto Rico are pre-screened prior to entering into jury selection to address their knowledge of English. And second, Your Honor, jurors were given questions, all of them. And when they answered those questions, defense counsel and the United States could see how they were interacting in the English language and make a determination as to whether they understood what the questions were and how they could explain them in the English language. So we submit that the jury that was actually chosen for this trial was proficient enough in English to understand the proceedings. Now as to sufficiency, now defendants questioned whether, in fact, there was the enterprise in this case. We submit that there was what's called an association in fact enterprise. And the evidence of this was shown through the testimony of the three main cooperating witnesses, Christian Figueroa-Villera, Jose Gutierrez-Santana, and Wesley Figueroa-Cancel. They all testified that La ONU was a union between different public housing projects. And the evidence reflected that they had a common goal, they had a mission statement, and it was to obtain control to make more money. Now they had interdependence between its members. You'll see from the evidence that you had people from Las Glaviolas who were a drug point owner in Las Glaviolas, like Mr. Ramirez-Rivera, who would supply heroin to Las Dallas, obviously both public housing projects being part of La ONU. And you had people like Mr. who's called Jose Lo. And Jose Lo was Laureano Salgado. He would supply cocaine and would bring it from Las Dallas to Las Glaviolas. And all these members, they would share guns, and they would go out to murder people who were clearly identified with a rival gang, La Ronque ONU. So there is an association in fact enterprise in this case. On that point, you described, how many other murders were the subject of testimony in this case beyond Pecueroa? I think there were about maybe five? There were several murders that were, yes, Your Honor. And what was the rationale? Because the defendants you're dealing with here were not implicated in any of those murders, so what was the rationale for putting that evidence in? I mean, obviously it's pretty inflammatory stuff, raising some legitimate 403 concerns. So what was the rationale? What was the value of that evidence? Well, the relevance of that evidence, Your Honor, first is done to show the existence of an association in fact enterprise. One of the ways you can prove an association in fact enterprise is through the individual racketeering acts. And of course, each of these murders were an individual racketeering act. Now, from the participants of these murders, which given not all of them included the defendants, as you can see... None of them included the defendants, isn't that correct? Except for Pecuero, which is specifically charged in the indictment. But none of these other murders implicated the defendants, isn't that correct? They did implicate them, and they didn't personally participate in them, but it does implicate them because it shows the manners and means of the organization they are part of. The purpose of presenting these murders is to show what is corroboration of what the cooperators stated LAONU stands for. They said it's an organization that committed murder. Murder for a particular set of rules or reasons. Cooperation with law enforcement, rival gang member, and when you look at the murders that were presented, like Victor and Nafis, one of them, you'll see that because he was believed to be cooperating with law enforcement. Another murder that was presented, the Pet Boys murder that defendants complained about in the brief, which actually was charged in the indictment, in count eight and nine, was done because it was informed that he was an ally. Estabilizando, which means he's providing information to an arrival of an ally of the organization. Now, when you look at the amount of people that participated in these murders, it shows the fact that an association, in fact, exists. That these people are truly together. This is not about what they do in Las Gladiolas, what they do in Las Dalias. This is about a union. They are together, they commit murder together, and they brutally murder together. That's what La ONU is about, and that's why they were presented. To show to the jury that this, in fact, is an enterprise and that they are together. Now, the multiple conspiracy instruction that was brought forth by defendants, again, the court did not abuse its discretion in not providing this instruction because the main concern when providing this instruction is whether the defendants are going to be, or jurors are going to be misled into attributing guilt to them based on a conspiracy in which other defendants were involved. And this is not the case. The case, all three defendants were pinpoint identified as being members of La ONU, and they were, it showed that they were intertwined in disorganization, not only in drug trafficking and in firearms and in acts of violence. So we submit that the court did not abuse its discretion when choosing not to provide this instruction. Counsel, can I ask you about the, this goes to the cross-examination of Vasquez, who took the statement of Cruz. It wasn't the judge just wrong as a matter of law when he took the position that voluntariness is for me to decide. I decided that any cross-examination that might raise questions about the voluntariness or even the reliability of the confession more generally, that's not appropriate cross-examination. Isn't that just a ruling that's wrong as a matter of law? The point being, that wasn't a discretionary call, but informed the decision was a misunderstanding of the law. Isn't that so? We would submit that Crane v. Kentucky, which is the case that really guides us here, submit that the pure voluntariness, the question as to the voluntariness of the confession, it's only for the judge alone to decide. And the question as to the physical and psychological environment in which that confession was obtained, that is something that the defendants certainly have a right to present to the jury. Well, didn't the court limit their ability to explore all of those circumstances of the confession? When you look at the trial transcript and you read what the defense tried to do was literally or tried to implicate the fact that a written waiver wasn't secured, and that purely goes as to voluntariness. After that objection was granted, you see no attempt, real attempt by a defense, to somehow present evidence as to the physical and psychological environment in which that... But the waiver would be relevant to that. Voluntariness is the standard for suppressing the confession. And the jury has no role in that. But as to what weight to give to the confession, the jury does have a role. And whether there was a waiver, like whether there was a shining light in his face, or whether anything else was going on, would seem a relevant consideration for the juror to consider in trying to give weight to the confession. We would submit that the fact that a written waiver form, whether a written waiver form was or was not used, does not go to the physical or psychological environment in which... Is that like a 401 rule? It's just it's not prohibitive? It's just irrelevant? That seems awfully stark conclusion. He just wanted to... I understand the concern, of course. But we submit that it really... When you look at the transcripts or our reading of it, is that the spirit or intention of that question or how it was posed, it was strictly to voluntariness and not to what weight should be given to the confession or its reliability or its physical and psychological environment. It was literally whether a waiver was secured or not. And defense counsel had the opportunity after the objection was granted to somehow circumvent in another way, go into that subject, and it chose not to. So we submit that there could have been other ways, if they had the evidence or anything, to show that there was actually some sort of something that affected the reliability of that confession, which we submit that they don't. But if they had that, they did have the chance. They just chose not to or weren't able to. Counsel, the confession here seems to have been very consequential. There were very inculpatory things admitted to. Isn't this a situation that there's no audio recording, there's no video recording, there's no written... Nothing was taken down in writing contemporaneously. The testimony about the confession comes simply from Vasquez, who is recalling what the defendant said. Isn't that the nature of the evidence on the confession? It's just his account of what he remembers the defendant saying. That is correct, Your Honor, and that is correct. In the trial, that is the evidence. Doesn't that make it all the more important that the defense have an opportunity to explore all of the circumstances under which that confession was taken? It is important that they have the opportunity to explore all that. The thing is that they chose not to after they weren't allowed to go into whether the written waiver or waiver was secured. Certainly, if we would have seen any type of question that went into the reliability or the physical or psychological environment of the confession, we would have withheld objecting. But that wasn't the case. The question posed clearly went into the waiver. Could you just talk to me about the significance that the district court noticed in discussing the confession, which is that Cruz Ramos, at least, directed the court to the plea agreement, trying to establish his standing to object to the search of the house. And the plea agreement says, prior to the interview, the officers advised Cruz Ramos of his constitutional rights, which he voluntarily and knowingly waived. Yes, we noticed that when the court asked that to the defendant. What is the significance of that in the government's eyes with respect to this issue about the limitation on the defendant's right to inquire into the circumstances of the confession? Certainly, it was taken into consideration by the district court when denying the motion to suppress the confession. But I take it the jurors were not aware of that. They weren't aware. We didn't answer the plea agreement and said that we did not. We submit that, again, still there was other evidence in the record in the suppression hearing which showed that the actual confession was voluntary. The fact that the plea agreement was taken into consideration to determine that the confession was voluntary, I don't think it really, it doesn't affect or in any way made the decision to uphold the objection more prejudicial than that. Because, again, the defense counsel had the opportunity to present evidence as to the physical and psychological environment. And what the record reflects is that they really didn't have any such evidence. All they wanted to get out was the fact that a written waiver was there. So is that an argument that there's no prejudice, even if it was an error, because the only thing they're objecting to is the waiver, the written waiver? That they've identified nothing else that would have been shown? I would say that the, I don't want to, I would say that just that, can you repeat that again, Your Honor, just to make sure? That's okay, I'm fine. Thank you, counsel. Thank you. Your Honor, you're correct that there was a great deal of discussion in the court's decision about the good faith alliance. And the court stated that it was a good faith based on settled binding precedent and not deliberate reckless or gross inequity. However, Your Honor, at the time of the search, the settled binding precedent in this entire country was Coolidge versus New Hampshire that says an automobile has to be mobile for the exception to apply. They said the word automobile is not a talisman in the presence of which the Fourth Amendment disappears. That is the settled binding precedent in this entire country, including Puerto Rico. Now, with regard to inherent mobility, to speculate that this car somehow could have grown large tires and rolled over the cars parked behind it, I can't even begin to discuss that, Your Honors. I may as well be discussing whether or not a Chinook helicopter with a large magnet could have lifted it up. It is simply, it's simply just so outside the bounds of the record that I can't even begin to discuss it. What I would like to mention though is, Your Honor, Judge Thompson, you mentioned that the court suppressed the search of the flower stand. The flower stand was searched before the expedition. What the court, and I note, Your Honor, that the government did not appeal the suppression of the guns found in the flower stand. The court relied on the fact that, A, there was a good distance from the housing projects when he looked at it by aerial view. The shootout of a leader at the El Prado housing project weeks before, the court found was irrelevant to a search of a private home in a gated community. And I note also that El Prado is not one of the housing projects that issued here. Here it was Dalius and Gladiolus. The court found not only significant distance from the housing projects but a perimeter had been established. There was visual and audio, visual and video surveillance of the entire area. The vegetation around the house was monitored and it specifically said that from specific angles, you could see anybody emerging through the vegetation. The fact is that every reason that the search of the flower stand was suppressed, every single one of those grounds applies to the search of the expedition unless you apply the automobile exception, which I submit your honors is simply not applicable to a car that cannot be moved. If they want to say people could have come in somehow around the officer, snuck into the car, moved two cars out of the way and backed it up, I'm sure there's nothing in the record to support anything like that. In terms of the court's decision, the government's brief did not argue good faith or harmless health. What the government's brief did was cut and paste certain sections of the court's ruling and then argue as entitled to deference. None of our arguments, none of our arguments in terms of the case law that applies, the differences between the cases that apply in our case, none of those was addressed in the government's brief. So I am only going to be able to respond to the speculation to what I would have said if they had said something else. But what they said, your honor, was that this report is entitled to deference. I do want to mention in terms of the jury selection issues, and your honors, I'm not really prepared to address those but I understand counsel did not reserve time. So I would like to point out that yes, this shooting down of the helicopter which was mentioned to these jurors was a well-known incident that occurred that people might have been aware of. It was never mentioned at trial. It was not part of the indictment. It was 100% unnecessary to mention it at all. As far as the statement, your honor, the fact that this officer or detective by no means intended to disparage him. He said his habit is to get a waiver form, to have a waiver form signed. The fact is that the defense had the right to argue that this statement was never even made. And based upon, well, what do you do when you take a statement? You didn't do it now. What do you do when a defendant gives you a statement? I get a waiver. I write it down. I take notes. I have him sign off on it. The fact that that's his way of doing things and that was not done in this case is fertile cross for arguing to the jury not only that the statement isn't reliable, but that it was simply never made. We have a case involving a murder. I guarantee you that they have video equipment and they have paper in the District of Puerto Rico. And yet no effort to memorialize this was done. No effort to even write out a simple five-line waiver. I understand I have the right to remain silent. Anything I say can and will be used against me in a court of law. I have the right to an attorney. One will be appointed if I cannot afford one. I can stop answering questions at any time. Sign on the dotted line. That was not done. Nothing was done. And I know, Your Honors, that this is a case in which the entire Constitution of the United States was ignored from the time it went onto this property without even making the slightest attempt to get a warrant, driving back and forth between the police department and Burwinder State but never picking up a phone to get a telephonic search warrant, which could have been done in half the time it took them to drive back and forth. This is a case in which the PRPD chose to intentionally ignore the Constitution of the United States, possibly simply because they've been getting away with it for way too long. Thank you.